UNITED STATES of America, Appellee,

v.

Juan FERMIN, Hector Fermin, and Freddy Fermin, Defendants–Appellants.

Nos. 294, 295 and 1178, Dockets 93–1167, 93–1267 and 93–1731.

United States Court of Appeals, Second Circuit.

Argued June 3, 1994.

Decided Aug. 11, 1994.

Lawrence A. Dubin, New York City (Goldberger & Dubin, on the brief), for defendant-appellant Juan Fermin.

Bobbi C. Sternheim, New York City, for defendant-appellant Hector Fermin.

Kenneth A. Caruso, New York City (Andrew W. Feinberg, Brian H. Polovoy, Sherman & Sterling, on the brief), for defendant-appellant Freddy Fermin.

Robert W. Ray, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Alexandra Rebay, Asst. U.S. Atty., on the brief), for appellee.

Before NEWMAN, Chief Judge, OAKES and PRATT, Circuit Judges.

JON O. NEWMAN, Chief Judge:

Defendants Freddy Fermin ("Freddy"), Juan Fermin ("Juan"), and Hector Fermin ("Hector") appeal from judgments of conviction and sentences on various narcotics and firearm offenses entered by the United States District Court for the Southern District of New York (Louis J. Freeh, Judge). On appeal, each defendant asserts that the District Court committed legal errors in pretrial procedure, trial rulings, or sentencing determinations. We conclude that none of the asserted errors justifies a new trial for any defendant, though we disapprove or question certain sentencing determinations made by the District Court. We therefore affirm all the convictions but vacate and remand the sentences of Juan and Freddy for reconsideration.

### Background

Until their arrests in July of 1991, Juan and his two brothers, Freddy and Hector, operated a narcotics enterprise from their jointly owned auto-repair shop, 3 Way Autobody ("3 Way"), located in the Bronx. The Government first became aware of the Fermins' narcotics activity through the reports of confidential informants. The Government thereafter collected evidence of the brothers' activity at 3 Way through various undercover and surveillance operations, phone-tap and bugging devices, and searches of 3 Way and other related locations at the time of the Fermins' arrests.

Juan, Freddy, and Hector were initially indicted on multiple narcotics and firearm counts with many alleged co-conspirators. The Fermins were ultimately tried with three other co-defendants in March and April of 1992. The evidence presented at trial to establish that the three appellants were conducting a narcotics operation from 3 Way consisted primarily of numerous tape-recorded conversations between the Fermins and

other participants in the drug trade, the testimony of officers who conducted undercover and surveillance operations, and narcotics-related paraphernalia recovered from 3 Way and other locations connected to the Fermins.

After a seven-week jury trial, Freddy was convicted on all five counts submitted to the jury, and Juan was convicted on four of the five counts submitted to the jury. Specifically, both Juan and Freddy were convicted of conspiring to distribute and possess with intent to distribute heroin, cocaine, and crack from January 1, 1990, through July 16, 1991, in violation of 21 U.S.C. § 846; running a business for the purposes of distributing heroin, cocaine, and crack, in violation of 21 U.S.C. § 856(a); and using a firearm in relation to a narcotics conspiracy, in violation of 18 U.S.C. § 924(c). Juan was also convicted of operating a continuing criminal enterprise from January 1, 1990, through July 16, 1991, in violation of 21 U.S.C. § 848(a), and Freddy was also convicted on two additional firearms counts, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 922(g).

A hung jury as to Hector and another co-defendant in the first trial necessitated a second trial. After a subsequent three-week trial in May 1992, Hector was convicted on one narcotics count, conspiracy to distribute and possess with intent to distribute cocaine and crack, in violation of 21 U.S.C. § 846.

Juan was sentenced to a prison term of 388 months and five years of supervised release, Freddy received a sentence of 360 months' imprisonment followed by ten years of supervised release, and Hector was sentenced to 121 months' imprisonment as well as five years of supervised release.

## Discussion

I. Motion to Suppress Evidence from Electronic Surveillance

■ After an initial investigation, the Government applied for authorization to intercept telephone conversations from 3 Way. A 52–page affidavit by Drug Enforcement Administration ("DEA") agent William Klein provided the foundation for the wiretap application. The affidavit detailed observations and information from agents and two confidential informants ("CI–1" and "CI–2"), all of whom had conducted limited undercover operations within 3 Way. On the basis of this affidavit, then-District Judge Pierre N. Leval authorized the requested wiretaps for 30 days and subsequently renewed the wiretap orders. However, before trial the Government disclosed that Klein's affidavit contained misstatements and omissions concerning the criminal history of CI–1. Specifically, the affidavit had falsely stated that CI–1 had a 1978 narcotics conviction though he had no such conviction, and that CI–1 had been an informant since 1979 though he had begun to provide information only in 1984. The affidavit also failed to note that CI–1's weapons conviction involved the theft of a gun from an Assistant U.S. Attorney's office and incorrectly described this felony conviction as a misdemeanor.

After submissions from the parties, the District Court concluded that the defendants had failed to show that the affidavit contained intentional or reckless falsehoods that would justify a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Nevertheless, the Court decided to conduct an evidentiary hearing to clarify the record. After the hearing, the Court faulted the Government for its behavior but determined that there had not been an intentional misleading of Judge Leval. The District Court further concluded that even if the affidavit contained deliberate or reckless errors, a corrected affidavit still would have provided probable cause for Judge Leval to authorize the wiretaps.

We need not explore the reason for the affidavit's errors because we agree with the District Court's conclusion that Judge Leval would have found probable cause for the wiretaps even if presented with a proper affidavit. Despite the defendants' claims to the contrary, we do not believe Judge Leval would have completely discounted the evidence presented through CI–1 even if CI–1's criminal history and time as an informant had been accurately reported. The past reliability of CI–1 and the corroborating evidence in the affidavit would have sufficiently assured Judge Leval of CI–1's reliability in

this case. Cf. *United States v. Ofshe,* 817 F.2d 1508, 1513 (11th Cir.) (omission of informant's criminal convictions in search warrant application did not invalidate warrant), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987); *United States v. Levasseur,* 816 F.2d 37, 43–44 (2d Cir.1987) (failure of affidavit to properly outline informant's criminal history and other background information did not require *Franks* hearing). Moreover, the affidavit contained significant evidence stemming from Government agents and CI–2 that supported the probable cause finding and alone would have justified the wiretap authorization.

Finding no error in the District Court's conclusion that, even if the affidavit supporting the wiretap application included intentional or reckless falsehoods, the affidavit contained a "residue of independent and lawful information sufficient to support probable cause," *United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985), we thus agree with the Court's conclusion that suppression of the evidence obtained via the wiretaps was not required.

## II. Testimony Referring to "Criminal Histories"

During the first trial, DEA agent Klein was asked on cross-examination about his basis for applying for the wiretap order. On his redirect examination, he said that he relied in part on the "criminal histories ... of the defendants." Upon objection, the District Court immediately struck this comment, instructed the jury to disregard the remark, and denied the defendants' motion for a mistrial. Claiming that this Circuit mandates a new trial after the improper introduction of a defendant's past criminal record, Freddy contends that the District Court erred when it denied the mistrial motion. He relies on *United States v. Rinaldi,* 301 F.2d 576 (2d Cir.1962), which suggests that an improper reference to a defendant's criminal record requires a new trial.

We continue to believe that in some instances the improper introduction of evidence of a defendant's prior criminal record can constitute prejudicial error beyond the capacity of cautionary instructions to cure, *see Rinaldi,* 301 F.2d at 578; *see also United States v. Pagan,* 721 F.2d 24, 31 (2d Cir. 1983); *United States v. Figueroa,* 618 F.2d 934, 944 (2d Cir.1980). However, the incident here is considerably different from what occurred in *Rinaldi.*

In *Rinaldi,* though the defense had not placed the defendant's character in question, the prosecution directly asked the defendant's wife if her husband had ever been convicted of a crime, and she answered affirmatively. *See* 301 F.2d at 577–78. In the instant case, the defense took the risky step of challenging before the jury the evidence Klein relied upon when seeking authorization to wiretap the offices of 3 Way. Then on redirect, when the prosecution sought to clarify the basis for the wiretap application, Klein made his unanticipated reference to "criminal histories." Thus, the reference to the defendant's criminal record in *Rinaldi* was the product of a blatantly improper question by the prosecution, whereas the reference in this case was a fleeting portion of a response to a proper question prompted by the defense's line of questioning.

Moreover, to the extent that Klein's reference to "criminal histories" might be considered improper, any resulting prejudice was minimal and harmless. One count of Freddy's indictment required a prior felony conviction as a predicate, and thus the jury knew that the Government would seek to show that Freddy had a criminal record, and it later learned through a stipulation that Freddy in fact had a prior conviction. Moreover, Klein's remark did not refer to prior convictions or to any particular defendant, and the District Court promptly gave a curative instruction.

Klein's one inadvertent, ambiguous comment concerning "criminal histories," which was immediately corrected by the District Court's curative instruction, was not so prejudicial that a new trial was required, especially in the context of a seven-week trial at which some defendants were acquitted. *See United States v. Stromberg,* 268 F.2d 256, 269 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); *United*

*States v. Dorn,* 561 F.2d 1252, 1257 (7th Cir.1977).

### III. Sufficiency of Evidence

Freddy Fermin contends that the evidence at his trial was insufficient to support his conviction for using a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Hector Fermin claims that the evidence at his trial was insufficient to support his narcotics conspiracy conviction. Applying the traditional standard of "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (footnote omitted), we conclude that both Freddy's and Hector's claims are unavailing.

■ A. *Freddy's firearm conviction.* A search of an upstairs office in 3 Way soon after the Fermins' arrest unearthed a loaded 12–gauge shotgun secreted in a closet, as well as two boxes of ammunition in a nearby desk. Freddy claims that the discovery of this weapon cannot support his conviction under section 924(c)—which outlaws using or carrying a firearm "during and in relation to any ... drug trafficking crime"—because he was not present at 3 Way when the gun was found, and there was no direct evidence of his actual or constructive possession of the gun.

■ This Circuit will sustain a section 924(c) conviction if the evidence shows that a defendant strategically placed a weapon so as to enable ready access to it during a drug transaction, *see, e.g., United States v. Taylor,* 18 F.3d 55, 58–59 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2720, 129 L.Ed.2d 845 (1994); *United States v. Lindsay,* 985 F.2d 666, 672 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 103, 126 L.Ed.2d 70 (1993); *United States v. Medina,* 944 F.2d 60, 66 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992); *United States v. Torres,* 901 F.2d 205, 217–18 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Freddy suggests, however, that in all such cases there was direct evidence that the defendant had been nearby or in possession of the weapon. In this case,

he claims, there was no evidence to suggest that he even knew of the existence of the weapon the Government found in 3 Way. We disagree.

■ Ample evidence demonstrated that Freddy engaged in numerous narcotics transactions from the office where the gun was found. Moreover, in a taped narcotics-related conversation Freddy made various references to this gun. Though Freddy correctly notes that the Government's case on this count rested on circumstantial evidence connecting Freddy, his narcotics activity, and the gun, a jury may always base its verdict on reasonable inferences from circumstantial evidence, *see, e.g., United States v. Libera,* 989 F.2d 596, 601 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993). The circumstantial evidence in this case suffices to sustain Freddy's conviction. *See Taylor,* 18 F.3d at 58–59; *Lindsay,* 985 F.2d at 672; *Torres,* 901 F.2d at 217–28; *United States v. Meggett,* 875 F.2d 24, 29 (2d Cir.), *cert. denied,* 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989); *see also United States v. Lasanta,* 978 F.2d 1300, 1308–09 (2d Cir.1992) (noting cases upholding section 924(c) convictions when "weapon was found on premises that clearly served as an operations base for narcotics transactions.").

■ B. *Hector's conspiracy conviction.* Hector does not deny the existence of a narcotics conspiracy, but challenges the sufficiency of the evidence showing his participation in it. "[O]nce a conspiracy between two or more defendants is found to exist, though the link between another defendant and the conspiracy need not be strong, the evidence must suffice to permit the jury reasonably to find the element of that defendant's participation—like every element—proven beyond a reasonable doubt." *United States v. Jones,* 30 F.3d 276, 281–82 (2d Cir. 1994). Hector concedes that the Government introduced three taped conversations that purportedly reveal his participation in the conspiracy, but claims that his conviction cannot be sustained solely on the basis of these recordings. We disagree.

The taped conversations, which the jury could find revealed Hector discussing drug transactions from 3 Way, provide more than sufficient evidence to support his conviction. Though the conversations were in code, the code was so transparent that a reasonable jury could readily conclude that Hector was a participant in the narcotics conspiracy. For example, in one conversation Hector discusses, from the offices of an auto-repair shop, a transaction price for "wedding dresses." In other conversations Hector uses unusual numerical terms common only in the drug trade.

Additionally, DEA agent Timothy Sullivan testified that the coded conversations involving Hector were narcotics related.[1] Though concern has previously been expressed about the use of expert testimony concerning ambiguous conduct to "carry the prosecution's proof above the [sufficiency] line," *United States v. Young,* 745 F.2d 733, 766 (2d Cir. 1984) (Newman, J., concurring), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *see also United States v. Brown,* 776 F.2d 397, 401 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *id.* at 404 (Oakes, J., dissenting), this case does not involve truly ambiguous conduct that an expert has deemed criminal. Rather, the transcript of Hector's coded conversations clearly appears drug related even without the help of an expert's view. Thus, even giving Sullivan's "expert" testimony "little weight in our sufficiency analysis," *United States v. Boissoneault,* 926 F.2d 230, 234–35 (2d Cir.1991), we conclude that a jury could reasonably find, simply from the transcript of his conversations, that Hector was a knowing participant in his brothers' narcotics conspiracy.

## IV. District Court's *Allen* Charge and Partial–Verdict Instruction

■ Throughout the course of deliberations in the initial trial, the jury struggled to reach a complete verdict, and it expressed its difficulty through a series of notes to the District Court. Freddy contends that the District Court's responses to the jury's notes were improper and had a coercive effect upon deliberations. His claim is without merit.

On the second day of deliberations, the jury sent out two notes: the first came from the foreperson and asked the Court to tell one juror that he "just can't walk out of deliberations"; the second came from a juror who stated his belief that his decision "will become a deadlock issue." In response, the District Court decided to re-read to the jury that part of its main charge explaining each juror's obligation to listen to the opposing views of others without surrendering conscientiously held opinions.

During the morning of the fourth day of deliberations, the jury sent a note stating that it was deadlocked on one of the counts of the indictment. As the District Court contemplated an appropriate response, the jury sent out other notes that suggested it was still deliberating. The District Court refrained from giving an *Allen* charge, *see Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896) (approving instruction to encourage a verdict from a deadlocked jury), and simply in-

---

1. Hector and Juan also assail the presentation of Sullivan as an expert on the meaning of various conversations. At both trials, Sullivan testified about drug dealings and coded conversations, and he provided an explanation of specific conversations introduced by the Government. Hector and Juan complain that the District Court improperly let Sullivan invade the jury's province by indicating that the conversations concerned narcotics transactions.

 Expert testimony about narcotics operations has long been considered appropriate, and admission of such testimony is left to the trial court's discretion to be overturned only if "manifestly erroneous." *See, e.g., United States v. Cas-*

*tillo,* 924 F.2d 1227, 1232 (2d Cir.1991); *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

Though we have expressed concern when an expert explicitly concludes that a defendant's conduct constituted the charged crime, *see, e.g., United States v. Boissoneault,* 926 F.2d 230, 233 (2d Cir.1991); *United States v. Scop,* 846 F.2d 135, 140–42 (2d Cir.1988); *Nersesian,* 824 F.2d at 1308, Sullivan's testimony was kept as generalized as possible, and the District Court took steps to insure that his testimony remained within proper bounds. The Court's admissibility decisions were not "manifestly erroneous."

formed the jury to continue to deliberate in accordance with prior instructions.

During the morning of the fifth day of deliberations, the jury sent out a note stating:

> [T]he jury is deadlocked in two places. We have gone around this for the last two days. We don't see the situation changing. What should we do?

After discussion with counsel, the District Court decided to give a modified *Allen* charge and also decided to advise the jury that it was permitted to return a partial verdict. Freddy's counsel explicitly objected to the partial verdict reference.

Three and one-half hours after receiving the *Allen* charge and partial-verdict instruction, the jury reported that it was deadlocked ten-to-one on two matters but had reached agreement on the other counts (one juror had been excused after deliberations had begun). Over the defendants' objections, the District Court decided to receive the jury's partial-verdict. The jury returned to report guilty verdicts on most counts, though one defendant was acquitted. The jury was unable to reach a verdict as to two other defendants.

The District Court's responses to the jury and the procedure concerning the *Allen* charge and partial-verdict instruction were in full accord with this Circuit's precedents. We have consistently approved the use of an *Allen* charge in the face of an apparent deadlock as long as such a charge is carefully crafted to avoid coercing jurors. *See United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991). We have also approved the receipt of a partial verdict in multi-defendant criminal trials and have suggested that a jury should understand that it has the option to return such a verdict. *See United States v. DiLapi*, 651 F.2d 140, 146–

47 (2d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

The District Court did not give the *Allen* charge or the partial-verdict instruction hastily. Only after the jury had indicated repeatedly that it was deadlocked and had explicitly sought the Court's guidance did the Court proceed with these instructions. Furthermore, the Court's language was not improperly coercive and specifically stressed that the jurors should not surrender any conscientiously held views. *See United States v. Roman*, 870 F.2d 65, 76–77 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989); *United States v. Robinson*, 560 F.2d 507, 517–19 (2d Cir. 1977), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). As for the partial-verdict instruction, it is clear that the District Court conformed to our admonition that juries "should be neither encouraged nor discouraged to return a partial verdict, but should understand their options, especially when they have reached a stage in their deliberations at which they may well wish to report a partial verdict as to some counts or some defendants." *DiLapi*, 651 F.2d at 147.[2]

Significantly, the jury returned different verdicts as to different defendants, was unable to reach a verdict on certain counts, and reached a result consistent with its reports prior to the additional instructions. The verdict itself thus strongly indicates that individual attention was given to each defendant as to each count and that the *Allen* charge and partial-verdict instruction did not cause jurors to surrender their opinions merely to reach a result. *See United States v. Black*, 843 F.2d 1456, 1463 (D.C.Cir.1988) (noting that mixed verdicts demonstrate lack of coercion); *DiLapi*, 651 F.2d at 147 (noting that mixed verdict indicated each defendant received individual consideration).

**2.** Relying upon our statement that partial verdicts "should be neither encouraged nor discouraged," Freddy seems to suggest that we should craft a *per se* rule finding error whenever a trial court gives a partial-verdict instruction over a defendant's objection. However, since Fed. R.Crim.P. 31(b) authorizes a jury to return a partial verdict "at any time" and this Circuit believes that a jury should be aware of this option, *see DiLapi*, 651 F.2d at 147, we decline to create a rule that would allow a defendant to preclude a trial court from instructing a jury on its partial-verdict option. Among other problems, such a rule would create a troublesome bind for courts in multi-defendant trials when one defendant requests a partial-verdict instruction while another defendant objects to such an instruction.

V. Sentencing Issues

 A. *Juan's drug-quantity calculation.* Among other narcotics-related evidence, a set of drug records apparently reflecting drug transactions from 1983 to 1985 were discovered in a search of Juan's residences.[3] After calculating that the aggregate dollar amount in these records reflected cocaine sales of 58 kilograms, the District Court concluded that the "similarity, regularity and temporalness of the activity reflected in the 1983 and 1985 records is relevant conduct ... to the conduct charged against [Juan] in this case." The District Court thus added this 58 kilogram quantity to the 33.2 kilograms that the District Court determined as the amount related to the charged conspiracy to arrive at a base offense level of 36 (for 50–150 kilograms of cocaine, *see* U.S.S.G. § 2D1.1(c)). Juan claims that the Court erred by including the quantity of drugs reflected in the 1983–85 records as relevant conduct to his 1990–91 drug conspiracy offense. Specifically, Juan notes the lack of temporal proximity between the transactions at issue, as well as the limited evidence to indicate that the drug records reflected similar narcotics activity.

There is no question that relevant conduct—which encompasses acts "that were part of the *same course of conduct* or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2)—can include drug amounts not charged in the indictment, *see, e.g., United States v. Cousineau,* 929 F.2d 64, 67 (2d Cir.1991). Moreover, this Circuit does not rely on temporal proximity alone when deciding whether certain transactions are part of the same course of conduct, *see United States v. Santiago,* 906 F.2d 867, 872 (2d Cir.1990). Yet, the Government cannot cite a single case in which transactions that occurred five or more years apart were considered part of the "same course of conduct." In *Cousineau,* we approved the determination that drug quantities from un-

charged conduct two years prior to the dates of the charged conspiracy were part of the same course of conduct. *See* 929 F.2d at 68. We stressed, however, the "continuous nature of the conduct" as well as "the high degree of similarity between the uncharged conduct and the conduct" of conviction. *Id.*

In Juan's case, there is no clear evidence that the type of conduct reflected in the drug records for the 1983–85 period is even related to the conduct for which he has been convicted, let alone part of a pattern of continuous or similar behavior. Though the records memorialize what appear to be narcotics transactions, they do not include details to suggest that the conduct they reflect was similar to the illegal activity of the brothers' narcotics conspiracy. Even the Government's own expert could not conclusively state what type of drugs were involved in the records. Moreover, the drug records do not clearly indicate the nature of the transactions involved, the participants, or any discernible connection to the conduct constituting Juan's offense.

It is possible that the drug records concern conduct comparable to that for which Juan was convicted. However, the records, which relate to conduct more than five years prior to the conduct of the offense of conviction, do not demonstrate conduct "with a high degree of similarity" sufficiently to consider the drug amounts reflected in the records as relevant conduct. *See United States v. Hahn,* 960 F.2d 903, 910 (9th Cir.1992) (noting "where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary"); *see also United States v. Darmand,* 3 F.3d 1578, 1582 (2d Cir.1993) (discussing in dicta that drug sales three years apart might not be part of same course of conduct); *United States v. Barton,* 949 F.2d 968, 969–70 (8th Cir.1991) (suggesting that 1983 drug conduct was "too distant and

---

3. We reject Juan's claims that the District Court erred by admitting these records into evidence. In light of this Circuit's inclusionary approach to prior-acts evidence, *see United States v. Roldan-Zapata,* 916 F.2d 795, 804 (2d Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991), we are satisfied that these records were properly admitted as other-acts evi-

dence to show Juan's intent, especially since he denied involvement in the conspiracy and made his intent a central issue in dispute. Thus, the District Court's admissibility rulings cannot be deemed "arbitrary or irrational." *See United States v. Simmons,* 923 F.2d 934, 948 (2d Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991).

dissimilar" to comparable 1989 conduct of conviction to be used in calculating sentence). We therefore remand Juan's case for the recalculation of his sentence.

■ B. *Freddy's three-level increase as manager or supervisor.* Freddy contends that the District Court's conclusory statements at sentencing concerning his role in the offense do not support the three-level increase he received under U.S.S.G. § 3B1.1(b). Stressing our holding in *United States v. Stevens*, 985 F.2d 1175, 1184–85 (2d Cir.1993), that a sentencing court must make specific factual findings to support an upward adjustment based on the defendant's role in the offense, Freddy claims his sentence must at least be remanded for specific findings to support his "manager or supervisor" enhancement.

The Government responds that the District Court mentioned certain conversations between Freddy and Juan in support of its finding that Freddy acted in a supervisory role. Yet Freddy correctly notes that the statements cited by the Government involve merely conclusory references to various "transcripts" and establish only that Freddy was an active member in the brothers' drug conspiracy, not that Freddy was a "manager or supervisor" as required for a section 3B1.1(b) enhancement. Because the required "specific factual findings," *see Stevens,* 985 F.2d at 1184; *United States v. Lanese,* 890 F.2d 1284, 1294 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990), are lacking, we also remand this part of Freddy's sentence for reconsideration.[4]

### Conclusion

We have thoroughly considered the defendants' remaining contentions and find them to be without merit. We affirm the convictions of all three appellants on all counts on which they were convicted. We vacate and remand the sentences of Juan and Freddy

Fermin for further proceedings in accordance with this opinion. The sentence of Hector Fermin is affirmed.

---

4. Freddy also contests the District Court's imposition of a $2,500 fine to be paid out of his prison earnings over the course of his 30–year term of imprisonment under the Bureau of Prisons financial responsibility program. Even accepting Freddy's claims of indigence, we find no error in the District Court's assessment of a limited fine

to be paid out of Freddy's likely prison earnings. *See, e.g., United States v. Williams,* 996 F.2d 231, 233–34 (10th Cir.1993); *United States v. Turner,* 975 F.2d 490, 498 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993).