UNITED STATES of America, Appellee

v.

Donnie STROTHERS, Appellant.

UNITED STATES of America, Appellee

v.

William HOYLE, Appellant.

Nos. 93–3216, 94–3004.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 21, 1995.

Decided March 5, 1996.

Richard Seligman, appointed by the court, Washington, DC, for appellant Donnie Strothers.

Sebastian K.D. Graber, appointed by the court, Arlington, VA, for appellant William Hoyle.

Richard J. Nelson, Assistant United States Attorney, Washington, DC, argued the cause for the appellee. On brief were Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys.

Before: EDWARDS, Chief Judge; SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Concurring opinion filed by Circuit Judge SENTELLE.

KAREN LeCRAFT HENDERSON, Circuit Judge:

In April and May 1993, appellants Donnie Strothers and William Hoyle were tried, along with two codefendants, under a nine count indictment alleging various drug distribution offenses. Each appellant was convicted of one count of conspiring to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 846 and 841 and one count of distributing more than five grams of cocaine base in violation of 21 U.S.C. § 841. In addition, Hoyle was convicted of three counts of distributing cocaine base on specific dates in violation of 21 U.S.C. § 841.[1] As a consequence, on December 17, 1993 the district court sentenced Strothers to concurrent prison terms of life and 40 years and Hoyle to concurrent prison terms of life, 240 months and 480 months. The appellants challenge both their convictions and their sentences on various grounds. For the reasons set out below, we vacate each appellant's conspiracy conviction, and his consequent life sentence, because it was returned

---

1. The appellants' two codefendants were acquitted on all counts charged against them.

after a coercive deadlock instruction to the jury. We affirm the appellants' other convictions and the sentences thereunder.

Each appellant first challenges his convictions on the ground the trial judge delivered a coercive "anti-deadlock" instruction. On May 19, 1993, after a lengthy trial and eight days of deliberation, the jury foreman notified the court in writing that the jurors had reached unanimous verdicts with respect to all defendants on all counts of the indictment except count one, which charged all four defendants with conspiring to distribute fifty grams or more of cocaine base. The note explained that the jury could not reach a unanimous verdict on the conspiracy count with respect to two defendants. The trial judge, rejecting the defendants' suggestion that he take a partial verdict, recalled the jurors to the courtroom and delivered an "anti-deadlock" instruction. We agree with the appellants that the instruction given impermissibly departed from the language of this circuit's established deadlock charge and therefore vacate the appellants' conspiracy convictions under count one because the convictions most probably were affected by the defective instruction.

■ In *United States v. Thomas*, 449 F.2d 1177 (D.C.Cir.1971), "in the exercise of our supervisory power over the administration of the law in this circuit," we formally adopted the American Bar Association (ABA) deadlock instruction "as the vehicle for informing jurors of their responsibilities" in an apparent deadlock situation. 449 F.2d at 1187. The ABA instruction has since been included as the "Alternative A" deadlock charge in the model jury instructions for the District of Columbia. *Criminal Jury Instructions for the District of Columbia*, Instruction 2.91, Alternative A (4th ed.). In *United States v. Berroa*, 46 F.3d 1195 (D.C.Cir.1995), we affirmed our adherence to the ABA instruction and expressly held that the "Alternative B" model deadlock instruction, used by the district judge there, "departed from the anti-deadlock instruction approved by this court in *Thomas*" and "was presumptively coer-

cive." 46 F.3d at 1198. We specifically noted that Alternative B omitted an "important element of the ABA standard," namely " 'that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.' " *Id.* at 1197 (quoting *United States v. Spann*, 997 F.2d 1513 (D.C.Cir. 1993)). Here too the trial judge inexplicably elected to use Alternative B, which lacks the required admonition against surrendering one's honest conviction, in violation of our repeated directive to use the ABA deadlock instruction.[2] Thus, we conclude that the trial judge erred in giving the Alternative B instruction and that the jurors' subsequent deliberation and verdicts were tainted by that error. Accordingly, we vacate the appellants' conspiracy convictions under count one because the verdicts on that count appear to have resulted from post-deadlock deliberation.

Our decision to vacate the appellants' conspiracy convictions does not affect their other convictions. We know from the jury note that the jurors had reached a unanimous verdict on all but the conspiracy counts *before* receiving the anti-deadlock instruction. Contrary to the appellants' contention, we should not presume without any corroborative evidence that, after listening to the instruction, the jurors reconsidered or changed any of their votes on those counts to the prejudice of the appellants. Although we find that the instruction could have coerced the jurors holding out for acquittal on count one into voting to convict on that count, thereby breaking the deadlock and producing a unanimous verdict, we can identify no basis in reason or fact for presuming that the instruction could have influenced a jury already declared to be *unanimous* on the other counts to change its collective mind on those counts.

■ Next, Strothers argues that his conspiracy and distribution convictions should be vacated because the indictment alleged and the district court improperly admitted evi-

2. We are further troubled here by the court's murky admonition to "[r]emember that the nature of the value of your service as jurors in this case will lie on the quality of the verdict that you return."

dence of criminal acts he committed before he turned eighteen, effectively permitting the government to prosecute him for offenses he committed as a minor in violation of the Federal Juvenile Delinquency Act (FJDA). *See* 18 U.S.C. §§ 5031–5042. We disagree. As the Fourth Circuit has observed, the FJDA "does not, of course, prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor." The jury is "entitled to assess [testimony of a defendant's post-majority participation in conspiracy] in light of other evidence showing that [the defendant] had known of the [criminal] scheme since its inception." *United States v. Spoone*, 741 F.2d 680, 687 (4th Cir.1984), *cert. denied*, 469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929 (1985). In *Spoone* the Fourth Circuit upheld the appellant's conviction, concluding "[t]here is simply no reason to believe that the jury convicted [the appellant] of conspiracy solely because of his pre-eighteenth birthday activity, for the trial court repeatedly instructed the jury that it could not consider the juvenile acts as evidence of [the appellant's] guilt." *Id.; cf. United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir.) (holding defendant "cannot be held liable for pre-eighteen conduct, but such conduct can, of course, be relevant to put post-eighteen actions in proper context"), *cert. denied*, 502 U.S. 950, 112 S.Ct. 400, 116 L.Ed.2d 349 (1991). Here too, the trial judge circumscribed the jurors' use of the challenged evidence, instructing them it was admitted "for the limited purpose of enabling [them] to decide when, if ever, [Strothers] became a member of the conspiracy charged in count one." 5/10/93 Tr. 28. Accordingly, we find no error in its admission.[3]

Next, both appellants contend that the judge erred in admitting audiotapes of alleged drug transactions, along with a transcript thereof, because neither the tapes nor the transcript was properly authenticated and, in any event, the jury should have been permitted to read the transcript only while listening to the corresponding tapes. We find no reversible error in the admission of the tapes or the transcript.

■ We first conclude that the tapes were properly admitted. "The admission of recordings into evidence is committed to the sound discretion of the trial court, so long as the tapes are authentic, accurate and trustworthy." *United States v. Dale*, 991 F.2d 819, 842 (D.C.Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). Tapes may be authenticated "by testimony describing the process or system that created the tape" or "by testimony from parties to the conversation affirming that the tapes contained an accurate record of what was said." *Id.* at 843. In this case, a police witness described the taping and copying process and testified that the copies admitted at trial accurately represented what had occurred. In addition, police officers and informants who were parties to the recorded conversations themselves testified to the tapes' accuracy. Accordingly, we find no abuse of discretion in the court's admission of the tapes themselves. The admission of the transcript is another matter.

■ In *United States v. Slade*, 627 F.2d 293 (D.C.Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), this court affirmed the district court's decision to allow the jury to use government-prepared transcripts when listening to tapes during trial. We explained that "the jury was made aware that the transcripts offered only the government's interpretations" and the record in the case "provide[d] substantial support for the relative accuracy of the transcripts." *Id.* at 303. In *Slade*, however, the transcripts were used only as listening aids during trial. In this case, the transcript was actually admitted as evidence, creating a risk that the jurors may have relied on the government's version of the conversations, set out in the transcript, without simultaneously listening to the authenticated tapes to verify

---

**3.** In light of the judge's limiting instruction we need not decide whether, as the Eleventh and Seventh Circuits have concluded, evidence of pre-majority acts can be admitted as substantive evidence of a conspiracy without a limiting instruction. *See United States v. Cruz*, 805 F.2d 1464, 1476 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987); *United States v. Doerr*, 886 F.2d 944, 969 (7th Cir.1989).

the transcript's accuracy. For this reason we conclude that the district court erred in admitting the transcript into evidence. Under the circumstances, however, it was not reversible error. The jurors were on notice that the accuracy of the transcript was disputed and were expressly admonished by the court to accept what they heard on the tapes over what they read in the transcript.[4] We may presume the jurors followed the instruction, *United States v. Brown*, 16 F.3d 423, 430 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 257, 130 L.Ed.2d 178 (1994), and conclude that the transcript's admission was therefore harmless.[5]

■ Next, the appellants assert that the district court violated their rights to confront witnesses and to due process by restricting their ability to impeach Anthony Pratt, a government witness with a history of mental health problems. Specifically, they allege the court erred in refusing to furnish the defense with records of Pratt's mental health or to permit a psychiatric examination by a defense expert and by insisting that, if the defense cross-examined Pratt on his hospitalization for depression, the government be permitted to question him on redirect about the reason for his illness. We find no error in the court's rulings. The court acted within its discretion in finding Pratt competent to testify following his voir dire. *See United States v. Day,* 591 F.2d 861, 880–81 (D.C.Cir. 1978); *United States v. Heinlein,* 490 F.2d 725, 730 (D.C.Cir.1973). Nor was it an abuse of discretion to seal Pratt's medical records or to deny the request for a psychiatric examination.[6] The court at no time prohibited the appellants from impeaching Pratt's reliability by cross-examining him about his mental health but simply ruled that if they did the government could put Pratt's mental health into context on redirect. The appellants themselves then made the strategic choice to limit their examination of Pratt. They cannot now transform that choice into judicial error. *Cf. United States v. Tarantino,* 846 F.2d 1384, 1407 (D.C.Cir.) (holding that forcing defendant to make tactical decision whether to cross-examine witness and thereby open door to prejudicial contextual information did not violate confrontation clause or constitute abuse of discretion), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988).[7]

■ We next conclude that the appellants' sentences, other than under count one, should be affirmed. The appellants assert, primarily, that the district court failed to make particularized findings to support its finding that Strothers and Hoyle should be charged with distribution of, respectively, 52.53 and 25.56 kilograms of cocaine base. *See United States v. Anderson,* 39 F.3d 331, 351 (D.C.Cir.1994) (vacating co-conspirators' sentences and remanding "for particularized factual findings regarding the amount of cocaine attributable to each appellant's participation in the [conspiracy]"), *cert. denied,* —— U.S. ——, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995). We disagree. The presentence report sets out the amounts distributed by the drug conspiracy during the period each appellant was a participant. The report further notes that during his participation each appellant was a full partner, sharing costs and profits equally with each other and a

---

4. The judge instructed the jurors:
   While I am admitting [the transcript] into evidence, I want to inform you that the best evidence of the conversation, as recorded, is what you actually hear over the earphones, and to the extent that you may hear something over the earphones which is at variance with something that appears in the transcript, then what you hear over the earphones should control.
   4/14/93 Tr. 160.

5. We note that the appellants offered no transcript of their own to rebut the government's transcription of the tapes.

6. The district court explained:

I think it's a collateral fishing expedition beyond allowing you to inquire on voir dire, in advance of his testifying before the jury, to determine whether or not he is, indeed, competent to give the testimony that he gives. And I don't see anything in any of the medical records that I have been shown which is so arcane and so complex as to be incapable of comprehension by you in preparing a cross-examination of him.
4/13/93 Tr. 57–58.

7. In any event, the appellants never explained to the district court, or to this court on appeal, how these rulings prejudiced their defense.

third conspirator, Lazaro Santa Cruz, and is therefore chargeable with all of the drugs then sold. The district court adopted the report's findings and we may review them only for clear error. *United States v. Clarke*, 24 F.3d 257, 270 (D.C.Cir.1994).[8] Because they are supported by the trial evidence, they are not clearly erroneous.[9] Nor was it clear error to increase each appellant's offense level by three points based on his managerial role in the conspiracy. *See* U.S.S.G. § 3B1.1(b) (providing for three-point increase for "a manager or supervisor" of "criminal activity involv[ing] five or more participants."). The trial evidence showed that the appellants, together with Santa Cruz, directed and profited from numerous drug sales carried out by subordinate "runners." [10]

For the foregoing reasons, we reverse and vacate the appellants' conspiracy convictions and sentences under count one of the indictment. We affirm the appellants' convictions and sentences under the other counts.[11]

*So ordered.*

SENTELLE, Circuit Judge, concurring:

I concur without reservation in everything expressed in the majority opinion. I write separately only to express my concern with the existing state of circuit law with respect to the anti-deadlock charge, which I agree with the majority, compels us to reverse as

to Count I. I have abiding reservations about the past use of the "supervisory" power of this and other circuits to engage in the establishment of rules of law going far beyond anything I find compelled or even permissible in existing jurisprudence. In order to articulate those misgivings, I will review briefly what I see as the state of the law in the area of the anti-deadlock charge.

In *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Supreme Court considered a jury instruction that stated, in substance:

[I]n a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for ac-

---

8. The appellants contend they were entitled to an evidentiary hearing to dispute the findings. Such a hearing, however, is within the sentencing court's discretion. Fed.R.Crim.P. 32(c)(1) ("At the sentencing hearing, the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony or other evidence on the objections."). We find no abuse of discretion here as "[t]here is no indication that there was 'any dispute over facts material to his sentence that the court could not resolve without a full evidentiary hearing.'" *See United States v. Pologruto*, 914 F.2d 67, 69 (5th Cir.1990) (*quoting United States v. Mueller*, 902 F.2d 336, 347 (5th Cir.1990)).

9. Our reversal of the conspiracy conviction under count one does not affect the sentencing court's attribution to each appellant of the total

quantity of drugs distributed during his participation in the conspiracy. *See United States v. Saro*, 24 F.3d 283, 286 (D.C.Cir.1994) ("[A] sentencing court may include even acquitted offenses as 'relevant conduct'; a judge may well determine that the government has proved an offense by a preponderance of the evidence (the applicable standard for sentencing) even though the jury concluded that the offense had not been proved beyond a reasonable doubt.") (citing *United States v. Boney*, 977 F.2d 624, 635–36 (D.C.Cir.1992)).

10. In light of our conclusions on drug quantity and managerial role, we need not address Strothers's challenge to the presentence report's inclusion of pre-minority acts in his relevant conduct which does not affect his offense level or the length of his sentence.

11. In so concluding, we decline to address certain of the appellants' challenges which we have reviewed and found to be without merit.

quittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Id.* at 501, 17 S.Ct. at 157. The Court concluded that there was no error in these instructions. It reasoned that the object of the jury system is to secure unanimity by a comparison of views and by arguments among the jurors and it therefore "cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he himself does ... or that he should close his ears to the arguments of men who are equally honest and intelligent as himself." *Id.* at 501–02, 17 S.Ct. at 157.

Ninety-two years later the Court reaffirmed its reasoning in *Lowenfield v. Phelps,* 484 U.S. 231, 237–38, 108 S.Ct. 546, 550–51, 98 L.Ed.2d 568 (1988), where it stated: "The continuing validity of this Court's observations in *Allen* are beyond dispute, and they apply with even greater force in a case such as this, where the charge given, in contrast to the so-called 'traditional *Allen* charge,' does not speak specifically to the minority jurors."

Between the *Allen* decision and the *Lowenfield* decision the Court approved a contextual analysis to determine if a charge given a deadlocked jury is coercive. In *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (per curiam), the Court reviewed a judge's statement to the jury that "[y]ou have got to reach a decision in this case." Although the Court found that statement coercive and reversed the circuit court's affirmance of the underlying conviction, it did so noting that it was considering whether the statement "in its context and under all the circumstances of the case ... had the coercive effect attributed to it." *Id.* Most circuits have applied

that analysis in deciding *Allen* charge appeals. *See, e.g., United States v. Ajiboye,* 961 F.2d 892, 893 (9th Cir.1992) (noting Ninth Circuit's approach is to determine the propriety of the charge in its context and to allow an *Allen* charge in the absence of a showing that it was otherwise coercive); *United States v. Rodriguez–Mejia,* 20 F.3d 1090, 1091 (10th Cir.) (noting that Tenth Circuit has traditionally urged caution in the use of the *Allen* charge but it reviews instructions on case-by-case basis to determine whether the instruction had a coercive effect), *cert. denied,* —— U.S. ——, 115 S.Ct. 640, 130 L.Ed.2d 545 (1994).

The Court's decision in *Allen* has been the subject of a great deal of criticism from scholars[1] and courts of appeal alike. Three circuits—the Third, the Seventh, and this circuit—have abolished the use of the traditional *Allen* charge in favor of a more neutral version. *United States v. Brown,* 411 F.2d 930, 933–34 (7th Cir.1969), *cert. denied,* 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970); *United States v. Fioravanti,* 412 F.2d 407, 419–20 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States v. Thomas,* 449 F.2d 1177, 1187 (D.C.Cir.1971) (in banc). The majority of circuits allow an *Allen* charge in the absence of a showing that it was otherwise coercive, and all have upheld some form of a supplemental jury charge.

The Fourth Circuit has adopted a modified instruction, but has not completely barred the *Allen* charge. *See United States v. Sawyers,* 423 F.2d 1335, 1342 n. 7, 1343 (4th Cir.1970) (approving a modified *Allen* charge and recommending ABA standard). Most courts, however, have rejected the claim that the *Allen* charge is inherently coercive and unconstitutional but have urged trial courts to avoid substantive departures from anti-deadlock instruction formulations that have already received judicial approval. *See United States v. Fermin,* 32 F.3d 674, 680 (2d

---

1. There are numerous articles criticizing the use of the *Allen* charge. *See, e.g.,* Karen Pelletier O'Sullivan, Comment, *Deadlocked Juries and the Allen Charge,* 37 Maine L.Rev. 167 (1985); Paul Marcus, *The Allen Instruction in Criminal Cases: Is the Dynamite Charge About to be Permanently Defused?,* 43 Mo.L.Rev. 613 (1978); Comment,

*On Instructing Deadlocked Juries,* 78 Yale L.J. 100 (1968); Note, *Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge,* 53 Va.L.Rev. 123 (1967); Note, *Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge"* 31 U.Chi.L.Rev. 386 (1964).

Cir.1994) (observing that court has consistently approved the use of an *Allen* charge "so long as such a charge is carefully crafted to avoid coercing jurors"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995); *Potter v. United States,* 691 F.2d 1275, 1276–80 (8th Cir.1982). The First Circuit specifically declined to adopt the ABA standard because it does not wish to restrict trial judges as there are "occasions when it may be appropriate to remind the jurors of their duties in somewhat stronger terms than in the initial instruction." *United States v. Flannery,* 451 F.2d 880, 883–84 (1st Cir. 1971); *see also United States v. Bailey,* 480 F.2d 518, 518 (5th Cir.1973) (in banc) (affirming prior decisions approving the *Allen* charge and thereby rejecting panel's suggestion to abolish *Allen* in the Fifth Circuit); *United States v. Chigbo,* 38 F.3d 543, 544–46 (11th Cir.1994) (noting that the Eleventh Circuit allows the use of *Allen* charges), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

Finally, several courts have specifically acknowledged the continuing validity of *Allen* and have refused to join other circuits in holding such an instruction to be error per se. *Hoosic v. Fedders,* 916 F.2d 356, 357 (6th Cir.1990) (noting that "the Supreme Court has not overruled *Allen,* nor has it called into question the propriety of that decision"); *United States v. Cortez,* 935 F.2d 135, 140–41 (8th Cir.1991) (noting that the court stated more than two decades earlier in *Hodges v. United States,* 408 F.2d 543, 552 (8th Cir.1969), that the Supreme Court has not disavowed *Allen,* and the Eighth Circuit was not going to resolve the issue to the contrary), *cert. denied,* 502 U.S. 1062, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992); *United States v. Beattie,* 613 F.2d 762, 764 (9th Cir.) (noting that it had in countless cases approved an *Allen* charge and refusing to join other circuits in holding such an instruction to be error per se), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). I find this point quite compelling and do not understand how this circuit has simply ignored the fact that the Supreme Court has not overruled *Allen.*

In banning the use of the traditional *Allen* charge, all three circuits professed to be exercising their supervisory power with the ultimate goal of uniformity and reduced appeals. In *United States v. Fioravanti,* 412 F.2d at 414–20, the Third Circuit strongly criticized the use of the *Allen* charge, but did not reverse the conviction being challenged. Although the court did not re-examine the constitutional question, it noted: "Our refusal to reverse this conviction should not be taken to mean that we have tacitly approved of the Charge or that we intend, in the future, to ponder each case on its particular facts. On the contrary, we know from the experience in this circuit and from an examination of the experience in others that the use of the Allen Charge is an invitation for perennial appellate review." *Id.* at 419–20 (footnotes omitted). The court then instructed lower courts to use a prescribed charge and threatened that any variation from this charge may well be deemed reversible error. Moreover, the court proclaimed that it was articulating this prospective rule "[a]s a prophylactic device to eliminate future vexation. . . ." *Id.* at 420.

Similarly, the Seventh Circuit prospectively adopted an anti-deadlock instruction. *United States v. Silvern,* 484 F.2d 879 (7th Cir.1973) (in banc); *United States v. Brown,* 411 F.2d at 933–34. First, in *United States v. Brown* the court concluded that "it would serve the interests of justice to require under our supervisory power" that district courts within the circuit comply with the ABA standard when faced with deadlocked juries in the future. 411 F.2d at 933–34. In a later decision, *United States v. Silvern,* the court noted that although the *Brown* court's intention was to produce uniform practices within the circuit, "it has not had that result." 484 F.2d at 882. Consequently, the court exercised its supervisory power in the interest of judicial economy and uniformity, and mandated that district courts follow the precise language of the ABA standard. This time, however, the court threatened that if any deviation occurred, the resulting conviction would be reversed and remanded for a new trial. *Id.* at 883 (citing *Fioravanti,* 412 F.2d at 420). The court gave this directive even

though it found the supplemental instruction to be proper under the circumstances.

In *Thomas,* 449 F.2d at 1186, this court decided that "the time ha[d] come to follow the path [the Third and Seventh Circuits] have traveled and lay down the same mandate." We reversed a conviction based on a guilty verdict returned after the district court told the deadlocked jury that it was not going to declare a mistrial and thereby require a retrial of the case, referred to its substantial backlog of work, and opined that to spend another day before another jury retrying this case did not make sense. *Id.* at 1183. The court also instructed that a juror in the minority should re-examine his position. *Id.* at 1180. We concluded that these comments created a substantial possibility of jury coercion, and then went on to adopt prospectively the ABA standard. *Id.* at 1184–88.

In *Thomas* we asserted that our supervisory power was clear in order to predicate our decision on "needs of judicial administration." 449 F.2d at 1187. I disagree. The supervisory power of federal courts is a concept that, while acknowledged, has uncertain origins and dimensions. It has been the subject of much scholarly inquiry and debate. *See, e.g.,* Sara Sun Beale, *Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts,* 84 Colum.L.Rev. 1433 (1984) (*"Reconsidering Supervisory Power"*); L. Douglas Harris, Note, *Supervisory Power in the United States Courts of Appeals,* 63 Cornell L.Rev. 642 (1978) (*"Intermediate Supervisory Power"*); Comment, *Judicially Required Rulemaking as Fourth Amendment Policy: An Applied Analysis of the Supervisory Power of Federal Courts,* 72 Nw.U.L.Rev. 595 (1978) (*"Judicially Required Rulemaking"*); Matthew E. Brady, Note, *A Separation of Powers Approach to the Supervisory Power of the Federal Courts,* 34 Stan.L.Rev. 427 (1982) (*"Separation of Powers"*); Alfred Hill, *The Bill of Rights*

*and the Supervisory Power,* 69 Colum.L.Rev. 181 (1969) (*"Bill of Rights"*); Note, *The Supervisory Power of the Federal Courts,* 76 Harv.L.Rev. 1656 (1963) (*"Supervisory Power"*).

Supervisory power has been defined as the power to control the administration of justice. *McNabb v. United States,* 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). Although the Supreme Court's supervisory authority appears to be rooted in Article III of the Constitution and in the doctrine of the separation of powers, the circuit courts' supervisory authority over the district courts has a much more nebulous origin.[2] The supervisory power of appellate courts is said to encompass a "general authority over the administration of justice in the inferior federal courts; and has been regarded as a basis for implementing constitutional values beyond the minimum requirements of the Constitution, or at least affording a basis for their implementation on other than constitutional grounds." *Bill of Rights,* 69 Colum.L.Rev. at 182. Nevertheless, "[w]hatever its historical underpinnings, the exercise of the supervisory power denotes a distinctive form of judicial lawmaking by the federal courts." *Judicially Required Rulemaking,* 72 Nw.U.L.Rev. at 615. Courts have invoked this doctrine for a variety of purposes, including to establish rules that are prospective in effect.

The abolishment of the *Allen* charge by three federal circuits is a prime example of the use of supervisory power as "a convenient tool with which to control trial judge discretion, enabling appellate courts to overturn lower court decisions in the absence of reversible errors of law." *Intermediate Supervisory Power,* 63 Cornell L.Rev. at 644 (footnote omitted). The ostensible goal of each court was, in the interest of justice, to reduce the number of appeals and the "drain on appellate resources" by promoting uniformity among trial judges. *Thomas,* 449 F.2d at 1184; *see also Silvern,* 484 F.2d at 882–83;

**2.** It is very difficult "to identify a statutory basis for the appellate courts' exercise of supervisory authority to declare new procedural rules for the district courts in the course of adjudication of individual cases." *Reconsidering Supervisory Power,* 84 Colum.L.Rev. at 1479. One commen-

tator suggests Congress enact statutory authority or promulgate an amendment to the Federal Rules of Criminal (and Civil) Procedure expressly granting the courts of appeals the authority to establish procedures for the district courts within their circuits. *Id.*

*Fioravanti,* 412 F.2d at 420. These courts have claimed a supervisory power to formulate rules of general applicability, even without constitutionally impermissible conduct in the trial court. The Seventh and Third Circuits have done so even in the absence of a finding of *reversible* error. *See Silvern,* 484 F.2d at 882–83; *Fioravanti,* 412 F.2d at 420. These rulings impose more rigorous standards than the minima imposed by the Constitution.

In my opinion, and as others have said before me, a "court of appeals is not 'the court of ultimate review' and its province as a court is limited to reversing district courts *only when prejudicial error is found.*" *Burton v. United States,* 483 F.2d 1182, 1189–90 (9th Cir.) (Byrne, J., dissenting) (emphasis in original), *rev'd on other grounds,* 483 F.2d 1190 (9th Cir.1973). Moreover, I believe that the task of writing jury instructions is one that should be left to the discretion of the district court. If the court misstates the law in an instruction and the effect is prejudicial, then the appellate court will ordinarily find this reversible error. But our role as an appellate court is not to write a manual of jury instructions or engage in "*a priori* processes of word fixation." *Silvern,* 484 F.2d at 884 (Pell, J., concurring in part and dissenting in part). I view such promulgation of prospective rules as judicial legislating.

In particular, it is unclear to me where the courts of appeals derive the power to control the practice of the district courts when it is not constitutionally mandated. In *Thomas* we carefully noted that we were not holding the *Allen* charge was per se coercive; rather we insisted that the decision was grounded in the notion of judicial economy. Yet Judge Robb noted in his dissent in that case that it was improper for this court to abolish the *Allen* charge "[s]ince the Supreme Court has not disavowed the charge it is not for us to do so." *Thomas,* 449 F.2d at 1189 (citing *Hodges,* 408 F.2d at 552). Under the aegis of judicial administration, courts have exercised their supervisory power to formulate rules extending procedural protections beyond constitutional requirements.

I am concerned that the supervisory power has been exercised not only as legislation in derogation of the separation of powers, but also in disregard for the Supreme Court's holding in *Allen.* How is it that circuit law can supersede the Supreme Court's holding? *See United States v. U.S. Gypsum Co.,* 550 F.2d 115, 131 n. 4 (3d Cir.1977) (Adams, J., concurring) (noting that in the Third Circuit, the *Fioravanti* charge supersedes a supplemental instruction approved in *Allen* ), *aff'd,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). I am mystified by the notion that a circuit "can lawfully announce that an instruction to a jury which the Supreme Court has specifically and squarely held is not reversible error in federal criminal trials shall in the future constitute reversible error when given in such trials conducted in [that circuit]." *Silvern,* 484 F.2d at 886 (Stevens, J., concurring). Had I been faced with the issue *de novo,* I too would have declined "to exalt the recommendation of the Bar Association over the decisions of the Supreme Court of the United States." *Thomas,* 449 F.2d at 1191–92 (Robb, J., dissenting). The question Judge Robb asked twenty-four years ago remains unanswered: when the district court has used the traditional *Allen* charge, will we presumptively reverse on the basis that it did not use the ABA standard in derogation of the Supreme Court's holding in *Allen? Id.* at 1192. I hope the answer is no.

Recent cases in this and other circuits, including *United States v. Spann,* 997 F.2d 1513 (D.C.Cir.1993), indicate that courts purporting to require strict adherence to the circuit's adopted form will allow variances if they are in substantial conformity with the adopted charge. *Id.* at 1518–19 (upholding charge as "entirely unobjectionable" because, although it did not fully comply with *Thomas,* it contained the elements of the ABA standard). *But see United States v. Berroa,* 46 F.3d 1195, 1197–98 (D.C.Cir.1995) (reversing a supplemental jury instruction as presumptively coercive because the district court departed from the anti-deadlock instruction approved in *Thomas* and omitted an element of the ABA standard). *See also United States v. Allen,* 797 F.2d 1395, 1399–1400 (7th Cir.) (holding variance between anti-deadlock instruction given and instruction approved in *Silvern* was too insignificant to constitute

plain error), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986). This practice demonstrates how perplexing the purported basis for abolishing the *Allen* charge really is: courts are now faced with appeals alleging not that the trial court departed from the law as declared by the Supreme Court or enacted by the Congress, but rather as recommended by the ABA and ratified by the circuits.

This result was predicted by Judge Robb, who noted that "if in spite of our pleas for conformity district judges have strayed from the litany approved by the Supreme Court I think it is reasonable to assume that they may also deviate from the formula prescribed by the Bar Association. If they hear not the Supreme Court and this court neither will they be persuaded by the Bar Association; and, contrary to the hopes of the majority, the 'aberrations of the charge' which disturb the majority will still occur." *Thomas,* 449 F.2d at 1192.

The ostensible rationale for prescribing specific language—reducing or eliminating appeals—is defeated by the courts' toleration of variations from the more neutral ABA charge. Just as was the case with variances from the traditional *Allen* charge, judges give modified versions of the modified charges. *See, e.g., Silvern,* 484 F.2d at 888 (noting district judge recognized he gave "a modified charge, *modified from the Allen charge,*" which was a violation of the court's direction in *Brown* ). I believe that we should permit such variations, as they allow the district judges to do their job with the flexibility that task requires. More importantly, I am convinced that we do not wield legitimate authority to require a particular form of language, neither compelled by the Constitution, nor mandated by the Supreme Court.