**UNITED STATES of America, Appellee,**

v.

**Melvin L. LAMPKIN, Appellant.**

**Nos. 96–3128, 96–3129.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 1, 1998.

Decided Nov. 3, 1998.

---

Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant, with whom A. J. Kramer, Federal Public Defender, was on the briefs.

Richard E. Gardiner, appointed by the court, was on the brief for appellant Troy E. Lampkin.

Kimberley S. Knowles, Assistant U.S. Attorney, argued the cause for appellee, with whom Wilma A. Lewis, U.S. Attorney, John R. Fisher, Thomas C. Black and T. Anthony Quinn, Assistant U.S. Attorneys, were on the brief. MaryPatrice Brown and M. Evan Corcoran, Assistant U.S. Attorneys, entered appearances.

Before: EDWARDS, Chief Judge, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

On March 5, 1996, pursuant to a search warrant, police officers searched an apartment at 1962 West Virginia Avenue, N.E., in the District of Columbia. At the time of the search, there were three adults (appellants Melvin Lampkin and Troy Lampkin, and Thomas Davenport) and five juveniles (Michael Thomas, Anthony Millhouse, Lavon Howard, Kellie Mitchell, and Catherine Pledger) in the apartment. The search uncovered ziplock bags of cocaine base on a table and hidden in a ceiling light fixture, and a pistol hidden in a chair cushion. Subsequently, an indictment was returned, charging both Melvin and Troy Lampkin with possession with intent to distribute more than 5 grams of cocaine base ("PWID"), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) [Count One], and employing a minor to commit the same drug offenses, in violation of 21 U.S.C. § 861(a)(1) [Count Three]; Melvin Lampkin, alone, was charged with carrying a firearm during a drug trafficking offense [Count Two], carrying a pistol without a license [Count Four], and possession of unregistered ammunition [Count Five]. Following trial on these counts, a jury convicted both Lampkins on Counts One and Three; however, Melvin Lampkin was acquitted on Counts Two, Four, and Five.

Appellants seek to overturn their convictions on a number of grounds, only three of which raise substantial questions for consideration by this court. Appellants claim that the trial judge erred (i) in repeatedly instructing the jury that three juvenile witnesses who testified against the Lampkins could not face prosecution in federal court, (ii) in allowing the jury to consider videotaped evidence that was never presented in open court or subjected to cross-examination, and (iii) in admitting a prior consistent statement of a key Government witness. Appellants also claim that the trial judge erred in imposing a special assessment of $100, rather than $50, for each of appellants' convictions. The Government concedes that we must remand the special assessment to allow the trial court to impose the correct amount. The Government also concedes error on the first three points, but argues that each error is harmless.

After careful review of the record in this case, we find that the first two errors at issue require the reversal of both appellants' convictions on Count Three, as well as Troy Lampkin's conviction on Count One. The errors were harmless, however, with respect to Melvin Lampkin's conviction on Count One, because there was ample independent evidence linking him to the drugs. As for the third cited error, we agree with the Government that it was harmless error for the District Court to admit a prior consistent statement of Kellie Mitchell, because the statement was merely cumulative of other evidence adduced at trial.

## I. BACKGROUND

### A. The Arrest and Indictment

On March 5, 1996, three members of the Metropolitan Police Department executed a search warrant in an apartment at 1962 West Virginia Avenue, N.E., in the District of Columbia. Inside, the police found eight people, 2.3 grams of cocaine base in 16 ziplock bags on a table, 31 grams of cocaine base in 202 ziplock bags hidden in a ceiling light fixture, and a pistol hidden in the cushion of a chair. Of the eight people in the apartment, three were adults—appellants Melvin and Troy Lampkin, as well as Thomas Davenport—and five were juveniles—Michael Thomas, Anthony Millhouse, Kellie Mitchell, Lavon Howard, and Catherine Pledger. The police also found keys to the apartment in Melvin Lampkin's jacket, as well as Melvin Lampkin's car registration on the same table as the 16 ziplock bags. They also found $231 in cash in Troy Lampkin's pants pocket.

The police arrested the adults and brought the juveniles in for questioning. That night, the police conducted video-taped interviews of the juveniles. Upon examination, Michael Thomas's fingerprints were found on the clip of the gun and Lavon Howard's fingerprints were found on the light fixture. No fingerprints from Melvin or Troy Lampkin were found on either the gun or the drugs.

On April 2, 1996, the Lampkins were charged with PWID and employing a minor to commit the drug offenses. Melvin Lampkin was also charged with three gun and ammunition possession offenses. The juveniles were not charged with any offenses.

### B. The Trial

Melvin and Troy Lampkin were tried together, in a trial commencing on June 25, 1996. During the trial, the building landlord testified that he had rented the searched apartment to Melvin Lampkin, and the police officers testified as to the items found in the apartment. The heart of the Government's case, however, was the testimony of three of the juveniles: Thomas (age 17), Millhouse (age 14), and Mitchell (age 15). Thomas and Millhouse testified that they had sold drugs for the Lampkins in the past, and that the Lampkins kept the drugs in the light fixture. Millhouse also testified that, on the night of the search, he had seen Melvin Lampkin with a gun. Mitchell testified that she saw Melvin reach into the light fixture that night and give Troy some cocaine to sell to a customer waiting at the door. She also testified that she saw Melvin Lampkin remove a gun from his waistband and place it under a pillow on the couch.

The credibility of the juvenile witnesses was suspect, to say the least. Thomas, in particular, seemed to have difficulty understanding most of the questions asked of him, his answers were often vague and unresponsive, the prosecutor led him on a number of occasions, and his answers to most of the central questions about the drugs and the gun changed after his recollection was refreshed by reference to the testimony that he had given before the grand jury. Millhouse testified that he had been smoking marijuana on the night of the search and that he did not have a good memory of the events of that night. Mitchell admitted that she had been smoking marijuana on the night of the search, that during her initial police interview she said she did not know if Melvin Lampkin sold drugs, and that during this interview she said it was Thomas, not Melvin Lampkin, who had taken drugs from the light fixture that night.

#### 1. The Erroneous Instruction

During the cross-examination of Thomas, defense counsel attempted to show that Thomas had a deal with the prosecutor, pursuant to which he would escape prosecution in exchange for testifying against the Lampkins. *See* Trial Transcript ("Tr."), 6/26/96 at 209–11. In response to questions from defense counsel, Thomas appeared to indicate that he had been told by a prosecutor that he was not being charged because he was testifying against the Lampkins. *See id.* at 210–11. However, at a bench conference during cross-examination, the trial judge made it clear to counsel that his line of inquiry was pointless. The court instructed counsel that

> it is only fair, and it becomes more and more fair as we go, to make it abundantly clear to this jury that the United States

[Attorney's Office] does not have jurisdiction [over the juvenile witnesses], that's why I wanted to say it at first and that's why I wanted to say it for every juvenile. *Id.* at 218–19. Then, immediately following Thomas's testimony, the court instructed the jury as follows:

Members of the Jury, you have heard the testimony of Mr. Michael Thomas, who is a juvenile, providing testimony on behalf of the Government.... You are instructed that it is the District of Columbia Corporation Counsel that has the authority, the jurisdiction, to decide whether to proceed with any charges against a juvenile. The United States Attorney and his Assistant United States Attorney, such as the Assistant United States Attorney in this case, has no such authority.... A supervisor at the District of Columbia Corporation Counsel has ... indicated there will be no prosecution of Mr. Thomas as a juvenile arising from the events of [March 5, 1996].

Tr. 6/27/96 at 77–78.

At the conclusion of Millhouse's testimony, the District Court told the jury that the same instruction applied to Millhouse. *See* Tr. 6/27/96 at 143. Defense counsel then brought to the court's attention the fact that under 18 U.S.C. § 5032, the U.S. Attorney's Office did in fact have jurisdiction to prosecute the juveniles. The court acknowledged the error, but nevertheless repeated the instruction, over defense objection, in its final charge to the jury. *See* Tr. 7/2/96 at 6A–11.

### 2. The Thomas Video Tape

Early in the trial, the Government offered into evidence the video tape of the police interviews of the three juveniles made on the night of the arrests. Defense counsel objected, claiming that admission of the tape would violate the Confrontation Clause. *See* Tr. 6/26/96 at 41. The trial judge admitted the tape over counsel's objection. Subsequently, Government counsel attempted to rehabilitate Thomas on re-direct by playing the portion of Thomas's video-taped interview in which he said that he retrieved drugs from the light fixture at the request of Troy Lampkin. *See* Tr. 6/27/96 at 73. Over defense counsel's objections, the District Court allowed the Government to play a portion of the tape.

It appears that approximately three minutes of Thomas's statement were actually played during trial, *see id.* at 69, an amount that Government counsel recalls as "only a short segment" of the total interview. Brief for Appellee at 40 n.12. Subsequently, however, in the middle of its deliberations, the jury sent a note to the trial court asking for the video tape of the police interviews and the transcript of each of the juveniles' trial testimony. The trial court informed the jury that the trial transcript was unavailable; but the trial judge gave the jury the entire video tape to play in the jury room, including the portion of the Thomas statement that was never played in court. Government counsel conceded that it was error for the District Court to allow the jury to hear and consider the entire video-taped statement.

### 3. Mitchell's Prior Consistent Statement

On cross-examination, Mitchell was impeached with her statement to the police that it was Michael Thomas, not Melvin Lampkin, who had retrieved drugs from the light fixture during the night in question. On re-direct, the Government elicited from Mitchell, over objection, that she had told the grand jury that it was Melvin Lampkin who had retrieved the drugs from the light. *See* Tr. 6/28/96 a.m. at 76. The Government concedes that admission of this prior consistent statement was error.

### 4. The Special Assessment

On July 8, 1996, the jury returned guilty verdicts against both Lampkins for PWID and for employing a minor to commit the drug offenses. The jury acquitted Melvin Lampkin of the gun and ammunition possession charges. The District Court imposed a special assessment of $100 for each of appellants' convictions.

## II. ANALYSIS

### A. The Erroneous Instruction

■■ All parties agree that the District Court's repeated instructions to the jury that

the United States did not have jurisdiction to prosecute the juvenile witnesses was an erroneous statement of the law. *See* 18 U.S.C. § 5032 (Supp. II 1996) (establishing procedures for federal prosecution of juveniles). Therefore, we must determine whether this conceded error requires reversal. To do so, we look to the proceedings as a whole and reverse only if the error "undermine[s] confidence in the conviction when viewed in light of all that took place." *United States v. Yunis*, 924 F.2d 1086, 1096 (D.C.Cir.1991). If the error "had substantial and injurious effect or influence in determining the jury's verdict," it cannot be viewed as harmless. *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The trial judge gave the erroneous instruction three times: once following Thomas's testimony, once when the judge told the jury that the instruction applied to Millhouse's testimony, and once in the court's final charge (after the trial judge had been advised by counsel that the instruction was legally in error). The prejudice from the error is arguably mitigated somewhat by the fact that the United States Attorney rarely exercises its jurisdiction over juveniles. Nonetheless, there was no good reason for the District Court to offer any instruction on this matter, much less *sua sponte*. It goes without saying that the trial judge certainly would not have advised the jury on the frequency with which the United States makes deals with cooperating witnesses, for such an instruction would not be in the Government's interest and it would offer the jury little, if any, relevant information. So we are not here pondering whether the erroneous instruction that was given was close to something that the trial judge might reasonably have given to the jury. Rather, we are considering an instruction that was clearly wrong with respect to a matter that should not have been before the jury.

The most important point to be made here is that the trial judge's erroneous instruction

robbed the appellants of their primary defense. The defendants wanted to show that the principal witnesses against them testified only to escape prosecution themselves, and thus that they lied with good motive to do so. The defendants were improperly foreclosed from pursuing this line of defense. In *United States v. Salerno*, 937 F.2d 797, 809–10 (2d Cir.1991), the trial judge refused to allow the defendant to cross-examine key Government witnesses on the issue of bias, and then refused to allow him to raise the issue when presenting his own case. The court held:

> This was not a harmless error. By instructing Ianniello to wait to make the bias inquiry, and then refusing to allow it, the district court effectively prevented Ianniello from presenting a defense. This was an error of constitutional magnitude. The Supreme Court has long held that criminal defendants have, at a minimum, "the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). See also *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)....

*Id.* at 810, *rev'd on other grounds*, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992).[1] We think that the holding in *Salerno* is precisely on point here: if a trial court commits error and thereby prevents a defendant from presenting a viable defense, that error is not harmless.

■ The Government emphasizes that Michael Thomas appeared to believe that he had been offered a deal in exchange for his testimony. As long as Thomas had the subjective belief that he had made a deal to cooperate, and he was vigorously cross-examined on the subject, the Government argues, the court's erroneous instruction did nothing to bolster his credibility and was therefore harmless error. We disagree.

---

1. Ianniello's convictions, along with those of his seven codefendants, were also reversed on an entirely unrelated ground. The Supreme Court subsequently reversed the Second Circuit on this unrelated ground. *See United States v. Salerno*, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). The Second Circuit's holding as to Ianniello's inability to present a defense, however, remained intact; Ianniello was subsequently severed from the case. *See United States v. Salerno*, 974 F.2d 231, 232 (2d Cir.1992).

The erroneous instruction followed immediately after Thomas's confused testimony, then the instruction was repeated twice more. Indeed, the trial court carried out its stated desire to make it "abundantly clear" to the jury that the United States could not prosecute Thomas or any of the juvenile witnesses. Furthermore, even if Thomas thought he had made a deal with the Government (and his testimony is very confusing on this point), Millhouse and Mitchell testified to no such thing. It is true that defense counsel decided not to cross-examine Millhouse on agreements to cooperate and only briefly cross-examined Mitchell on the subject. But the decision to forego this line of cross-examination was certainly reasonable, given that the District Court had made it absolutely clear that it was going to impress upon the jury the "fact" that the United States did not have jurisdiction to prosecute the juveniles. In short, the jurors were given the clear view that the juveniles could not be prosecuted by the Government. The result was that the defendants were effectively foreclosed from attempting to show that the juveniles had a strong motive to testify on behalf of the Government and against the Lampkins.

Under these circumstances, there is a real possibility that the instruction had a substantial effect on the jury's verdict with respect to the Lampkins' convictions for unlawfully employing a minor. See Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239. The evidence against the Lampkins on this charge was far from overwhelming, given that the credibility of the juveniles was very much in doubt throughout the trial. The jurors apparently did not believe Millhouse's and Mitchell's testimony regarding Melvin Lampkin's possession of the gun, for they acquitted him of the gun charges. Thomas's testimony was even more suspect. At one point during his testimony, the trial court even asked him if he had been high on marijuana during his testimony the previous day. See Tr. 6/27/96 at 13. Absent the juveniles' testimony—tainted by conceded error—that they sold drugs for the Lampkins, there was literally no evidence to convict appellants of this offense.

■ We need not decide whether this error without more warrants reversal. Rather,

we find that, when the erroneous instruction is considered along with the trial court's error in allowing the jury to consider videotaped evidence that was never presented in open court or subjected to cross-examination, there is no doubt that reversible error was committed. Accordingly, both Lampkins' convictions for unlawfully employing a minor must be reversed. See United States v. Smart, 98 F.3d 1379, 1391 (D.C.Cir.1996) ("[I]f the evidence presented at trial is ambiguous, even a relatively minor error requires reversal.").

Troy Lampkin's PWID conviction must be reversed for the same reason. The only evidence, other than the juveniles' testimony, offered against him on this count was the fact that he was in the apartment at the time of the search and $231 in cash was found on his person. This evidence would not have been sufficient to convict Troy Lampkin on Count One. See, e.g., United States v. Foster, 783 F.2d 1087, 1089 (D.C.Cir.1986) ("Numerous decisions of this Circuit have made clear that mere proximity or accessibility to contraband will not support a conclusion that an individual had knowing dominion and control over it."); United States v. Pardo, 636 F.2d 535, 549 (D.C.Cir.1980) (same).

■ We decline, however, to reverse Melvin Lampkin's PWID conviction. Apart from the juveniles' testimony, there was ample circumstantial evidence of Melvin's dominion and control over the apartment and the drugs inside: the testimony of the landlord that Melvin Lampkin had rented the apartment and lived there; the discovery of the apartment keys in his jacket and of his car registration on the table; and the presence of the ziplock bags both in plain view on the table and in the light fixture. Given this independent evidence, we are satisfied that the erroneous instruction did not have a substantial effect on the jury's verdict against Melvin Lampkin on Count One.

*B. The Thomas Video Tape*

■ Throughout the trial, defense counsel strongly objected to the admission of the video tape of the police interviews of the juveniles, on both Confrontation Clause and hearsay grounds. See Tr. 6/26/96 at 41;

6/27/96 at 68, 74. Reasonably construed, these objections encompass the original admission of the tape, the playing of small segments of the tape for the jury during the course of trial, and the release of the entire tape to the jury for its review and consideration during jury deliberations. Indeed, during oral argument before this court, Government counsel conceded that it was error for the District Court to allow the jury access to the entire videotaped police statement of Michael Thomas, when only a brief portion of the statement was subjected to cross-examination in court. We agree. The only question here is whether the error was harmless.

"To protect jury deliberations from improper influence, we ordinarily restrict the jury's access only to exhibits that have been accepted into evidence and 'consideration by the jury of documents not in evidence is error.'" *United States v. Holton*, 116 F.3d 1536, 1542 (D.C.Cir.1997) (citation omitted); *see also Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) ("[T]rial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."); *United States v. Cunningham*, 145 F.3d 1385, 1397 (D.C.Cir.1998) (reversing convictions where jury was inadvertently provided with unredacted 911 tapes implicating appellant). The precise content of the unconfronted portion of Thomas's statement is not clear from the record; it is clear, however, that the disputed amount of tape that was made available to the jury was not an insignificant portion of the tape, because the Government acknowledges that only a minor segment of Thomas's taped statement was played for the jury in open court. It is also clear that the jury had a great interest in reviewing the testimony of the juveniles—during its deliberations, the jury asked for *all* of the juveniles' testimony, but received only the video tape.

■ The burden is on the Government to establish that the unconfronted portions of the tape given to the jury were not prejudicial, *i.e.*, that the error was harmless. *See*

*Smart*, 98 F.3d at 1390; *Kotteakos*, 328 U.S. at 760–61, 66 S.Ct. 1239. In the seminal *Turner* case, two key Government witnesses acted as deputy sheriffs in charge of the jury throughout the trial. There was no showing that the deputies discussed the case with the jury members, but the Court noted that the deputies' testimony at trial was central to the Government's case, and their credibility was "assailed" on cross-examination. *Turner*, 379 U.S. at 473, 85 S.Ct. 546. The Court reversed the convictions, explaining that "[t]he requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Id.* at 472, 85 S.Ct. 546 (citation omitted). Thus, under *Turner*, when evidence that directly pertains to the case has not been subjected to cross-examination but is nevertheless submitted to the jury, reversal is required unless the Government can show that the evidence did not prejudice the defendant.

With respect to Troy Lampkin's PWID conviction, the Government offers nothing to suggest that the conceded error was other than prejudicial. No one doubts that the unconfronted portions of the video-taped statement were directly relevant to the case. We know from the portion that was played in court that Thomas's statement strongly implicated Troy Lampkin. Furthermore, the Government conceded at oral argument that Thomas had not yet been informed that he was not going to be prosecuted at the time when he was interviewed. Finally, there seems little doubt that the jury reviewed the video tape, for the jury asked for all of the juveniles' testimony (but received only the video tape to review). On these facts, we cannot assume that the Government has met its burden. Rather, we must suppose that an error of this magnitude—jury exposure to unconfronted statements from a principal prosecution witness—is prejudicial unless the Government shows otherwise. The Government has shown nothing to support its claim of harmless error.

We very recently reiterated that in a harmless error inquiry, "[t]he question is 'whether the guilty verdict actually rendered

in *this* trial was surely unattributable to the error' " and not whether the appellant would have been convicted but for the error. *United States v. Maddox,* 156 F.3d 1280, 1283 (D.C.Cir.1998) (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)). "If the judge is in 'grave doubt' about the harmlessness of the error, he or she must reverse the conviction." *Smart,* 98 F.3d at 1390 (quoting *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). Particularly with respect to a witness like Thomas, who was effectively impeached on cross-examination, we cannot say that under these circumstances it was harmless error for the jury to have unlimited access to Thomas's videotaped statement about which he was never cross-examined. And, as noted above, when this error is considered along with the erroneous instruction, there is no doubt that reversible error was committed. Accordingly, we reverse Troy Lampkin's PWID conviction.

There is no basis, however, for us to reverse Melvin Lampkin's PWID conviction. As discussed above, there was ample independent evidence linking Melvin to the drugs such that we can say with fair assurance that the error here did not affect the jury's verdict against him.

## C. *Mitchell's Prior Consistent Statement*

■ Mitchell testified on direct examination that she had seen Melvin Lampkin take drugs out of the light fixture on the night of the search. She was impeached on cross-examination with her statement to the police that it was Thomas, not Melvin Lampkin, who had taken the drugs out of the fixture that night. The District Court then allowed the Government to elicit on re-direct Mitchell's grand jury testimony that she saw Melvin take drugs out of the light fixture on the night of the search and give them to Troy. Tr. 6/28/96 a.m. at 76. The Government concedes that this testimony was inadmissible hearsay that improperly bolstered Mitchell's direct testimony.

We find that this error was harmless in light of the strong circumstantial case against Melvin discussed above, the trial testimony of Thomas that the light fixture was a "stash spot" and that he had seen Melvin remove drugs from it, and Millhouse's testimony that the Lampkins kept drugs in the fixture and that he had seen Melvin "serve" drugs from the apartment on the day of the search. In other words, we are confident that Mitchell's prior consistent statement, which was merely cumulative of other evidence adduced at trial, did not affect the jury's verdict. *See Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239.

## D. *The Special Assessment*

■ Pursuant to 18 U.S.C. § 3013, appellants should have been charged a special assessment of $50 for each of their convictions. However, the District Court imposed a special assessment of $100 for each conviction, apparently pursuant to a recent amendment to § 3013 increasing the mandatory special assessment for felony convictions. *See* Mandatory Victims Restitution Act of 1996, Pub.L. No. 104–132, tit. II, § 210, 110 Stat. 1214, 1240 (1996). The Government concedes that the amendment was passed subsequent to the date of the offense and that a remand is therefore necessary in order to impose the appropriate special assessment of $50 per conviction. *See United States v. Grace,* 778 F.2d 818, 823 (D.C.Cir.1985). Because we affirm Melvin Lampkin's PWID conviction, we remand for the purpose of adjusting the special assessment on this conviction to accord with the preamendment version of 18 U.S.C. § 3013.

### III. CONCLUSION

For the reasons explained above, we reverse Troy Lampkin's convictions on Count One and Count Three. We also reverse Melvin Lampkin's conviction on Count Three. We affirm Melvin Lampkin's conviction on Count One, but remand to the sentencing court for imposition of the appropriate special assessment. The reversed counts are remanded for new trial.

*So ordered.*